IRA L. GOTTLIEB (SBN 103236)
igottlieb@bushgottlieb.com
LISA C. DEMIDOVICH (SBN 245836)
ldemidovich@bushgottlieb.com
BUSH GOTTLIEB
A Law Corporation
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260
Telephone:  (818) 973-3200
Facsimile:  (818) 973-3201

Attorneys for Plaintiff/Petitioner International
Organization of Masters, Mates & Pilots

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL ORGANIZATION OF MASTERS, MATES & PILOTS,<br><br>Plaintiff and Petitioner,<br><br>vs.<br><br>THE PASHA GROUP, PASHA HAWAII HOLDINGS LLC, PASHA HAWAII TRANSPORT LINES LLC, SR HOLDINGS LLC, SUNRISE VESSEL OPERATIONS LLC, and SUNRISE OPERATIONS LLC d/b/a PASHA HAWAII,<br><br>Defendants and Respondents. | **CASE NO.: 3:20-cv-04722**<br><br>INTERNATIONAL ORGANIZATION OF MASTERS, MATES & PILOTS' COMPLAINT FOR VIOLATION OF THE LABOR MANAGEMENT RELATIONS ACT AND PETITON TO COMPEL ARBITRATION (29 U.S.C. § 185) |

## **INTRODUCTION**

Petitioner and plaintiff International Organization of Masters, Mates & Pilots ("MM&P" or the "Union") has represented the Licensed Deck Officers ("LDOs") on four oceangoing containerships—the *Enterprise*, the *Pacific*, the *Reliance*, and the *Spirit*—since they were constructed in 1979 and 1980.  The LDOs consist of the captain (or master), chief mate, second mate, and third mate positions, and their employment terms and conditions are set forth in a collective-bargaining agreement ("CBA") that is modified

COMPLAINT

715360v1  12025-30001

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

through negotiations every few years, with the current agreement having a term from 2012 to 2027.  Many different companies have owned these vessels, including SeaLand, CSX, and Horizon Lines.  In 2015, Horizon Lines transferred title of the four vessels to defendant The Pasha Group, when it acquired the Horizon Lines' Hawaii trade lane business, and shortly thereafter re-branded the vessels with "Pasha Hawaii" on the vessels' hulls. The Pasha Group has continued to operate the Hawaii trade lane business of Horizon Lines in basically unchanged fashion and employed the LDOs who were previously employees of Horizon Lines to work as LDOs on the four rebranded Pasha Hawaii containerships.  The Pasha Group and various named subsidiaries assumed all the benefits and obligations of the collective bargaining agreement between MM&P and Horizon Lines.  The four acquired containership vessels' fuel licenses are expiring and The Pasha Group must either replace the vessels with new ships, have the ships converted to use a different form of fuel, or try to extend the fuel licenses.

In 2017, The Pasha Group announced it would build two new containerships for its Hawaii trade lane business, and it has almost completed construction of those vessels. MM&P has sought compliance with the CBA's new construction requirements and to negotiate training on the vessels as is required by the CBA, but Defendants have refused to do either.  MM&P filed a grievance under the CBA and submitted it to American Arbitration Association ("AAA"), but Defendants have refused to arbitrate the grievance based on a procedural defense that the grievance must go to an Licensed Personnel Board ("LPB") even though no LPB has been constituted for decades, all arbitrations since Defendants' acquisition have not gone to a LPB but arbitrators have been selected through a AAA panel, and the CBA expressly provides that arbitrability disputes must be decided by an arbitrator.

Additionally, this year, Defendants unilaterally eliminated the CBA-mandated position of an additional third mate, in breach of the CBA.  MM&P again filed a grievance and submitted it to AAA, which appointed Arbitrator Ronald Hoh for a September 8, 2020 hearing in Oakland.  Only after Defendants' representative agreed to these essential

Bush Gottlieb
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

elements did Defendants belatedly raise the same procedural defense , leading to their refusal to arbitrate this dispute as well.

This petition to compel arbitration—brought under Labor Management Relations Act ("LMRA") § 301, 29 U.S.C. § 185—requests the Court to require Defendants to engage in arbitration over unresolved disputes raised by the Union in the two pending grievances related to the job preservation and new construction terms of the parties' collective-bargaining agreement.  Defendants cannot refuse to arbitrate disputes because they want to violate the agreement's clear terms without any accountability when they have contractually agreed to resolve disputes through the arbitration process and submit arbitrability questions to an arbitrator.  MM&P hereby alleges:

## JURISDICTION

1.      This is an action to compel arbitration pursuant to a collective bargaining agreement under the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 141, *et seq.*, and particularly under Section 301 of the LMRA, 29 U.S.C. § 185 (2018).

2.      This Court has jurisdiction over this action pursuant to 29 U.S.C. § 185 (2018), and 28 U.S.C. §§ 1331 and 1337 (2018).

## INTRADISTRICT ASSIGNMENT

3.      Venue in this Court is proper under 28 U.S.C. § 1391 (2018) and 29 U.S.C. § 185 (2018).  Defendants, at all times herein mentioned, transact business within this judicial district and Defendants' office is located in San Rafael, California.

4.      The action should be assigned to the court's San Francisco/Oakland Division because the events and omissions giving rise to Plaintiff's claims occurred in the County of Alameda, where Defendants failed to fulfill their statutory and contractual obligations to MM&P, because, among other facts, the parties have met for collective bargaining negotiations at MM&P's Oakland office, and one of the arbitration proceedings that Defendants are now refusing to participate in was scheduled to occur in Oakland.

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

715360v1  12025-30001

# PARTIES

5.     Plaintiff MM&P is, and at all times herein mentioned has been, a labor organization as that term is defined in Section 2(5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(5) (2018), and maintains an office in Oakland, California.

6.     Plaintiff is informed and believes and thereupon alleges that defendant The Pasha Group ("TPG") is, and at all relevant times herein has been, a California corporation.  TPG is, and at all relevant times herein has been, an "employer" within the meaning of Section 2(2) of the NLRA, 29 U.S.C. § 152(2) (2018), because TPG operates with the other Defendants as a single employer of the LDOs represented by MM&P on the Hawaii trade lane.  Its principal place of business is located at 4040 Civic Center Dr., Suite 350, San Rafael, CA 94903.  TPG's Chief Executive Officer is George W. Pasha, IV, Agent of Service and General Counsel is Amy Sherburne Manning, and Chief Financial Officer is Jay Bowden.

7.     Plaintiff is informed and believes and thereupon alleges that defendant Pasha Hawaii Holdings LLC is, and at all relevant times herein has been, a Hawaii limited liability company authorized to do business in California, with a California office located at 4040 Civic Center Dr., Suite 350, San Rafael, CA 94903, as well as a wholly-owned subsidiary of TPG.  Pasha Hawaii Holdings is, and at all relevant times herein has been, an "employer" within the meaning of Section 2(2) of the NLRA, 29 U.S.C. § 152(2) (2018), because it operates with the other Defendants as a single employer of the LDOs represented by MM&P on the Hawaii trade lane.  Pasha Hawaii Holdings is managed by The Pasha Group; its CEO is George W. Pasha IV, Corporate Secretary and Agent of Service is Amy Sherburne Manning, and Senior Vice President, Fleet Operations is Edward Washburn.

8.     Plaintiff is informed and believes and thereupon alleges that defendant Pasha Hawaii Transport Lines LLC is, and at all relevant times herein has been, a California limited liability company located at 4040 Civic Center Dr., Suite 350, San Rafael, CA 94903, as well as a wholly-owned subsidiary of TPG.  Pasha Hawaii Transport Lines is,

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

COMPLAINT
Case No.: 3:20-cv-04722

715360v1  12025-30001

and at all relevant times herein has been, an "employer" within the meaning of Section 2(2) of the NLRA, 29 U.S.C. § 152(2) (2018), because it operates with the other Defendants as a single employer of the LDOs represented by MM&P on the Hawaii trade lane. Pasha Hawaii Transport Lines is managed by its CEO George W. Pasha IV, and its Secretary and Agent of Service is Amy Sherburne Manning.

9. Plaintiff is informed and believes and thereupon alleges that defendant SR Holdings LLC is, and at all relevant times herein has been, a California limited liability company located at 4040 Civic Center Dr., Suite 350, San Rafael, CA 94903, as well as a wholly-owned holding company of TPG. SR Holdings is, and at all relevant times herein has been, an "employer" within the meaning of Section 2(2) of the NLRA, 29 U.S.C. § 152(2) (2018), because it operates with the other Defendants as a single employer of the LDOs represented by MM&P on the Hawaii trade lane. SR Holdings is a holding company for various businesses; its CEO is George W. Pasha IV and Corporate Secretary and Agent of Service is Amy Sherburne Manning.

10. Plaintiff is informed and believes and thereupon alleges that defendant Sunrise Vessel Operations LLC is, and at all relevant times herein has been, a California limited liability company located at 4040 Civic Center Dr., Suite 350, San Rafael, CA 94903, as well as a wholly-owned subsidiary of TPG. Sunrise Vessel Operations is, and at all relevant times herein has been, an "employer" within the meaning of Section 2(2) of the NLRA, 29 U.S.C. § 152(2) (2018), because it operates with the other Defendants as a single employer of the LDOs represented by MM&P on the Hawaii trade lane. Sunrise Vessel Operations provides crew and vessel management services on the four containerships operated by the LDOs represented by MM&P; its CEO is George W. Pasha IV and Corporate Secretary and Agent of Service is Amy Sherburne Manning. Since at least June 6, 2018, Sunrise Vessel Operations has operated the four containerships, the *Enterprise*, the *Pacific*, the *Reliance*, and the *Spirit*, and oversees LDOs' crewing and payroll related to these four containerships.

11. Plaintiff is informed and believes and thereupon alleges that defendant

715360v1  12025-30001

1    Sunrise Operations LLC was a California limited liability company with its principal place

2    of business located at 4040 Civic Center Dr., Suite 350, San Rafael, CA 94903.  On April

3    24, 2018, Sunrise Operations LLC was converted to a North Carolina company, but it

4    retained its 4040 Civic Center Dr., Suite 350, San Rafael, CA 94903 address, as well as

5    continues to be a wholly-owned subsidiary of TPG.  Sunrise Operations is, and at all

6    relevant times herein has been, an "employer" within the meaning of Section 2(2) of the

7    NLRA, 29 U.S.C. § 152(2) (2018).  Sunrise Operations' managers are CEO George W.

8    Pasha IV, Secretary Amy Sherburne Manning, CFO Jay Bowden, and Senior Vice

9    President Edward Washburn, and all four company officials listed registered with the

10   North Carolina Secretary of State are listed as having the address of 4040 Civic Center Dr.,

11   Suite 350, San Rafael, CA 94903.

12                **DEFENDANTS OPERATE AS A SINGLE EMPLOYER**

13        12.    Prior to The Pasha Group's acquisition of four Horizon Lines vessels,

14   Horizon Lines and its subsidiaries owned and operated the four vessels—*Enterprise*,

15   *Pacific*, *Reliance* and *Spirit*.  In November 2014, TPG—without identifying any

16   subsidiary—announced in a press release that it planned to acquire Horizon Lines' Hawaii

17   business, including these four vessels, as follows:

18            **The Pasha Group**, a family-owned global logistics and transportation

19            company, today announced an agreement to **acquire the Hawaii trade-lane**

20            **business of Horizon Lines**, Inc., a Jones Act container shipping and

21            integrated logistics company, for approximately $141.5 million. The

22            transaction will greatly expand and complement **Pasha's** current offerings

23            for shipping between the mainland United States and Hawaii.

24            Under the terms of the agreement, **Pasha will acquire certain**

25            **subsidiaries** of Horizon constituting substantially all of Horizon's Hawaii

26            trade-lane business, including four Jones Act container ships. Immediately

27            following Pasha's acquisition of Horizon's Hawaii trade-lane business,

28            Horizon will be acquired by Matson pursuant to a merger. The transaction is

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

expected to close in 2015, subject to regulatory approval, satisfaction of the closing conditions to the merger of Horizon and Matson and other customary closing conditions.

**In becoming part of Pasha, Horizon's Hawaii business will operate alongside Pasha's existing operations**. With these additional vessels, Pasha will provide customers with a wider offering of high-quality, scheduled shipping and logistics services for containers, refrigerated containers, and a variety of roll-on/roll-off cargoes.

"Since Pasha entered the Hawaii transportation circuit nearly 10 years ago, we have elevated the quality of customer service," said George Pasha, IV, President and CEO. "With this acquisition, we will supplement that service and provide an improved, more competitive offering on the Hawaii trade lane."

"First and foremost, Pasha is a full-service transportation company," Pasha added, "and as such our primary goal is to enrich the transportation services available to our customers. A decade ago, we introduced the first pure car/truck carrier for the Hawaii-Mainland trade lane, the *Jean Anne*, in response to customers' needs. We now look forward to providing Pasha-quality service for even more of the people of Hawaii."

Pasha noted that environmental responsibility and stewardship will continue to be a major part of Pasha's culture and vessel operations with the addition and improvements to Horizon's ships. The company will also stay actively involved with local charities and organizations in the communities it serves. "We are excited to welcome Horizon into our 'ohana,'" Pasha said. (Emphasis added.)

[A true and correct copy of Pasha's Press Release on Horizon Lines' Acquisition from November 2014 is attached hereto as Exhibit A, and incorporated herein by this reference.]

Bush Gottlieb
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

715360v1  12025-30001

13.     The transaction was memorialized in a Contribution, Assumption and Purchase Agreement ("CAPA") that was filed with the U.S. Securities and Exchange Commission.  [A true and correct copy of the CAPA is attached hereto as Exhibit B and incorporated herein by this reference.]  Pursuant to Section 1.1(c)(i)(A) of the CAPA, SR Holdings purchased 100% of the issued and outstanding membership units of Sunrise Operations, which, based on the opening paragraph, is referred to therein as "Hawaii LLC" (the "Acquisition") [Exh. B, pp. 5-6].  Matson Navigation Company, Inc. purchased 100% of the issued and outstanding stock of Horizon Lines, Inc., which included its subsidiary, Horizon Lines, LLC (covering the Alaska trade lane business).

14.     Plaintiff is informed and believes and alleges thereupon that the Acquisition was completed on May 29, 2015—no LDOs were laid off and vessels that were in the middle of the Pacific Ocean on May 29 continued to operate without any major operational changes because the vessels needed to keep several thousand containers in transit when the acquisition occurred.  A month before the acquisition was completed, George W. Pasha IV wrote to MM&P President Captain Donald Marcus acknowledging "Sunrise will honor the contractual obligations set forth in the [CBA, and w]e look forward to working together with Masters, Mates & Pilots."  [A true and correct copy of Pasha's April 28, 2015 letter is attached hereto as Exhibit C, and incorporated herein by this reference.]

15.     TPG and Horizon Lines are also parties to an Assignment and Assumption Agreement ("Assumption Agreement").  [A true and correct copy of the Assumption Agreement is attached hereto as Exhibit D and incorporated herein by this reference.]  That Assumption Agreement defines TPG as "The Pasha Group ('Pasha Parent'), SR Holdings LLC ('Pasha Sub' and, together with Pasha Parent, 'Pasha')."  Only Sunrise Operations has ostensibly assumed the CBA.  [Exh. D, pp. 1 & 5].  The same person—Michael Zendan—signed on behalf of all parties to the CBA assumption agreement [Exh. D, p. 4]. MM&P was not a party to either agreement [Exhs. B & D].

16.     On May 30, 2015, the day after the Acquisition was completed, Pasha Hawaii's Bill Peterson emailed MM&P-represented masters on the four vessels welcoming

Bush Gottlieb
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

COMPLAINT
Case No.: 3:20-cv-04722

715360v1  12025-30001

them to Pasha Hawaii—without mentioning any Sunrise entity or differentiating between the two different entities with "Pasha Hawaii" in their name:

> I'd like to introduce myself, my name is Bill Peterson and I am Vice President of Operations for Pasha Hawaii. I want to welcome you, your officers and crew to Pasha Hawaii, a subsidiary of The Pasha Group. As you're aware we acquired the Hawaii trade-lane business of Horizon Lines yesterday and as a result, Pasha Hawaii assumes operations for Horizons' Hawaii business, including its four container ships, (Horizon Enterprise, Horizon Pacific, Horizon Reliance, and Horizon Spirit).  The Horizon Consumer will be on Time Charter to Pasha Hawaii from Matson until early July.

[A true and correct copy of Peterson's May 30 email is attached hereto as Exhibit E and incorporated herein by this reference.  *See* Exh. E, p. 1.]  Peterson identified the Liner Operations team, with five of the six team members coming from TPG, who are there to "ensure there is no ambiguity for the Senior Vessel Personnel (which includes LDOs) about what they are supposed to do and when." [*Id*., p. 2]. Peterson continues that the masters' "knowledge of these ships and this trade are recognized and I am looking for your help to make this endeavor a success." [*Id*.].  Peterson introduced Ed Washburn as "our" (i.e., Pasha Hawaii's) Vice President of Engineering and Technical Services, who will work "closely" with the then-vessel management contract Crowley/MTM, whose contract ended on or around May 2018, will "play a lead role in our New Build program" for the replacement vessels.  [*Id*., p. 5].  This correspondence demonstrates Pasha Hawaii executives Peterson and Washburn are integrally involved in labor relations related to the LDOs on the four containerships.

17.     In 2017, MM&P negotiated pursuant to a reopener term of the CBA in Seattle and Oakland.  Washburn appeared for management at all negotiation sessions. After the parties' first negotiation session in July 2017, MM&P filed a bad-faith bargaining unfair labor practice charge with the National Labor Relations Board ("NLRB") over, *inter*

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

COMPLAINT

715360v1  12025-30001

*alia*, a failure to provide information, alleging that four of the Pasha entities named here—

The Pasha Group, Pasha Hawaii Holdings LLC, SR Holdings LLC, and Sunrise

Operations LLC—are a single employer.  (Sunrise Vessel Operations LLC was not

registered with the California Secretary of State until April 16, 2018.)  After a full

impartial investigation, Region 20 of the NLRB issued a First Amended Complaint

("NLRB Complaint") identifying the four entities as a single employer, all violating the

employer's duty to bargain with the Union by refusing to provide information requested by

the Union regarding the blueprints for the *George III*.  [A true and correct copy of the

NLRB Complaint is attached hereto as Exhibit F and incorporated herein by this reference.

*See* Exh. F, p. 1 (caption).]  The NLRB Complaint stated the entities "constitute a single-

integrated business enterprise and a single employer within the meaning of the [NLRA]."

Specifically, the NLRB Complaint alleged that

> [a]t all material times, The Pasha Group, Pasha Hawaii Holdings LLC, SR
>
> Holdings LLC, and Sunrise Operations LLC (collectively Respondent), have
>
> been affiliated business enterprises with common officers, ownership,
>
> directors, management, and supervision; have formulated and administered a
>
> common labor policy; have shared common premises and facilities; have
>
> provided services for and made sales to each other; have interchanged
>
> personnel with each other; have interrelated operations with common vessels
>
> and contracts; and have held themselves out to the public as a single-
>
> integrated business enterprise. [*Id.*, p. 2 (Paragraphs 2(f)-(g))].

18.     On the eve of the NLRB trial set for January 30, 2018 [*id.*, p. 7], attorney

William Miossi, on behalf of all four entities, signed a Settlement Agreement with the

NLRB.  [A true and correct copy of the signed settlement agreement is attached hereto as

Exhibit G and incorporated herein by this reference.  *See* Exh. G, p. 2 (signature page)]

Representatives from all four Pasha entities signed the NLRB Notice Posting, with all four

entities (including TPG) agreeing to bargain in good faith with MM&P going forward.  [A

true and correct copy of the Notice Posting, except it has been rescaled from its original

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

8.5" by 14" size, is attached hereto as Exhibit H and incorporated herein by this reference. *See* Exh. H ("**WE WILL**, upon request, bargain in good faith with [MM&P] as the exclusive collective bargaining representative of **our unit employees**") (emphasis supplied)].  The joint representation in the proceeding before the NLRB further demonstrates the entities have a central labor policy.

19.     Plaintiff is informed and believes and thereupon alleges that Defendants operate, and at all relevant times herein have operated, as a single employer under the NLRA based on the factors established by the NLRB to determine whether to treat two or more distinct business entities as a single employer.  In particular, Defendants have interrelated operations, common management, centralized control of labor relations, and common ownership.  *See NLRB v. Big Bear Supermarkets*, 640 F.2d 924, 928 (9th Cir. 1980); *Rockwood Energy & Mineral Corp.*, 299 NLRB 1136, 1139 (1990), enf'd 942 F.2d 169 (3d Cir. 1993) (finding that stock purchasers are single employers with entity they purchased and are thus bound to the existing CBA).  At all relevant times, The Pasha Group, Pasha Hawaii Holdings LLC, Pasha Hawaii Transport Lines LLC, SR Holdings LLC, Sunrise Vessel Operations LLC, and Sunrise Operations LLC have been affiliated business enterprises with common officers, ownership, directors, management, and supervision; have formulated and administered a common labor policy; have shared common premises and facilities; have provided services for and made sales to each other; have interchanged personnel with each other; have interrelated operations with common vessels and contracts; and have held themselves out to the public as a single-integrated business enterprise, doing business as Pasha Hawaii.  Based on its operations, at all relevant times, The Pasha Group, Pasha Hawaii Holdings LLC, Pasha Hawaii Transport Lines LLC, SR Holdings LLC, Sunrise Operations LLC, and Sunrise Vessel Operations LLC have constituted a single-integrated business enterprise and a single employer within the meaning of the NLRA.

a.     Defendants have common officers, as George W. Pasha IV is the CEO and Amy Sherburne Manning is the General Counsel and Corporate Secretary of all six

COMPLAINT

1  companies.  Sherburne Manning has described under oath her General Counsel job duties

2  as "I'm responsible for directing all the legal affairs of The Pasha Group and each of its

3  subsidiary and affiliated companies."  Sherburne Manning has described under oath her

4  Corporate Secretary duties as "I am responsible for attending meetings of the boards or the

5  managing members of each corporation and each limited liability company when they are

6  held, taking the minutes of those meetings, transcribing the minutes of those meetings,

7  getting approval of the minutes of those meetings, and then entering those minutes into the

8  corporate record of the respective corporation or limited liability company. And I also keep

9  the records – the corporate records of each of those companies."  Jay Bowden is CFO of

10 both The Pasha Group and Sunrise Operations LLC.

11        b.      Defendants have common ownership, as the Pasha enterprise is a

12 "family-owned" company [Exh. A].  TPG purchased the Horizon vessels and 100% of the

13 shares of Sunrise Operations through a shell holding company without any employees, SR

14 Holdings [Exh. B].

15        c.      Defendants have common management, with Pasha Hawaii Holdings

16 being managed by The Pasha Group and Sunrise Vessel Operations being managed by

17 Sunrise Operations.  Immediately after the Acquisition, Bill Peterson, Pasha Hawaii's Vice

18 President of Operations, welcomed the MM&P-represented captains from Horizon Lines

19 to Pasha Hawaii [Exh. E, p. 1 & 5].  Since on or around August 1, 2015, The Pasha Group

20 and Sunrise Operations LLC have entered into a borrowed servant agreement for Edward

21 Washburn.  That agreement states that TPG "employs Ed Washburn" and it agrees "to

22 provide Sunrise Operations the services of Washburn from time to time" where "Washburn

23 shall perform supervisory services related to crew management and technical services

24 being provided to Sunrise Operations by third-party vendors."

25        d.      Defendants share Suite 350 at 4040 Civic Center Drive and the phone

26 number 415-927-6400.

27        e.      On June 30, 2020, Pasha Hawaii Fleet Superintendent Captain

28 Gregory Johnson sent the MM&P-represented masters of the *Enterprise*, *Pacific*, *Reliance*

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

12

Case No.: 3:20-cv-04722

715360v1  12025-30001

and *Spirit* "new updated Company on board procedures to be implemented on receipt" related to COVID-19, and attaching a document called Sunrise Operations COVID-19 On Board Precautions.  [A true and correct copy of the June 30 email and attachment are attached hereto as Exhibit I and incorporated herein by this reference.]

       f.    The Pasha Group's employee newsletter—called *Pasha People*— holds out MM&P-represented LDOs as Pasha employees.  An article in Volume 17 titled "Reaching New Heights" was dedicated to bringing Pasha employees "insights on the integration of the Horizon acquisition into our Pasha Hawaii family . . . and welcom[ing] our newest members from Horizon, who are now Pasha People."  [A true and correct copy of Volume 17: Reaching New Heights is attached hereto as Exhibit J and incorporated herein by this reference.]

       g.    In the same newsletter, Pasha Hawaii conceded the Horizon vessels' operations were interrelated with Pasha Hawaii's operations: "With the acquisition of Horizon Lines' Mainland/Hawaii trade lane assets, both teams faced the momentous task of onboarding Horizon's operations into Pasha Hawaii."  [A true and correct copy of Volume 17: Behind the Scenes is attached hereto as Exhibit K, and incorporated herein by this reference.]

       h.    TPG's Vice President Kai Marten also stated: "Perhaps the most challenging was the period of transition necessary to meld the two companies into one culture blending both processes and systems.  Onboarding institutional knowledge of integrated Horizon employees was vital, as there were several thousand containers to keep in transit while maintaining logistics and schedule integrity."  [Exh. K.]

       i.    George Pasha IV remarked in *Pasha People* of the Horizon acquisition: "The most positive outcome has been the opportunity to **combine** two very capable and professional teams and **meld** them into a high-performing organization, passionate about supporting one another with a win-win philosophy on behalf of their customers and The Pasha Group.  I am extremely proud of the talented and capable staff we have put **together, comprised of both Horizon and Pasha team players**." (Emphasis

Bᴜsʜ Gᴏᴛᴛʟɪᴇʙ
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

1    supplied.)  [A true and correct copy of *Pasha People*'s President Message is attached

2    hereto as Exhibit L, and incorporated herein by this reference.]

3           j.       LDOs crew Pasha Hawaii vessels and use their equipment.  Pasha

4    Hawaii's corporate office uses the same software programs as the programs on the vessels,

5    called Voyces [Exh. E, p. 3].  After the Acquisition, Pasha's information technology

6    department had to "integrat[e] Horizon's software programs into Pasha's, and eventually

7    creating proprietary software that would accommodate – and streamline – the customer

8    service needs of the expanded Pasha fleet."  [Exh. K].  Pasha's "IT Senior Vice President

9    and CIO David Beckerman and his team decided early on that the principal style of

10   integration would be 'absorption.'  That is, the Horizon Lines Hawaii operations would

11   largely be brought on to The Pasha Group's business processes and systems."  According

12   to the Company, by Day 10 after the Acquisition, on the *Enterprise*, *Pacific*, *Reliance*, and

13   *Spirit*, "vessel, trucking and terminal systems were all up and running in Pasha's

14   environment."  [*Id*.].

15          k.       The four containerships are registered with the 4040 Civic Center

16   Drive address.  [A true and correct copy of the U.S. Coast Guard Certificates of

17   Documentation for the four containerships are attached hereto as Exhibit M, and

18   incorporated herein by this reference.]

19          l.       The four containerships are branded with the Pasha logo and say

20   "Pasha Hawaii" on the hull. [A true and correct copy of *Pasha People*'s branding article is

21   attached hereto as Exhibit N, and incorporated herein by this reference.]  In Volume 17 of

22   *Pasha People*, Pasha explained "a strong brand identity" has always been important to

23   TPG and Pasha Hawaii, and announcing the "bow graph will be repeated on the *Jean Anne*

24   as well as the [Horizon] C8 and C9 vessels as they are folded into the Pasha family" [*Id*.].

25          m.       According to Pasha Hawaii's website:

26          Pasha Hawaii provides the broadest scope of ocean transportation services

27          between Hawaii and the Mainland with fixed-day sailings for containers,

28          rolling stock and out-of-gauge cargoes. The company operates five vessels in

Bush Gottlieb
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

Case No.: 3:20-cv-04722

COMPLAINT

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

1  active deployments and keeps one ship in reserve to cover routine vessel

2  maintenance. The below picture illustrates one of our container shipping

3  vessels called the *Pacific*, which carries shipping containers to and from the

4  U.S. Mainland and Hawaii. All of Pasha Hawaii's ships are built in the U.S.

5  by American workers and are proudly operated by American officers and

6  crew. Our vessels are efficiently sized with an **experienced crew** to allow

7  for faster loading and offloading of our customers shipping containers.

8  (Emphasis supplied.)  [*See* Pasha Hawaii's website at https://www.pashahawaii.com/

9  services/vessels/pacific (last visited July 8, 2020).]

10        n.        Defendants have a common labor policy as demonstrated *supra* in

11  paragraphs 16 and 17.  Additionally, on July 6, 2020, when MM&P's outside counsel Lisa

12  Demidovich responded to an email from AAA without altering the recipients, it was The

13  Pasha Group's Senior Vice President and General Counsel, Amy Sherburne Manning, who

14  responded to the labor arbitration correspondence by asking that going forward she, and

15  not Washburn, be copied on correspondence with the arbitrator. [A true and correct copy

16  of the July 6, 2020 correspondence from TPG's Sherburne-Manning is attached hereto as

17  Exhibit O, and incorporated herein by this reference.]

18        o.        Pursuant to its right under NLRA Section 8(a)(5), 29 U.S.C.

19  § 158(a)(5) (2018), MM&P has requested information from Defendants related to the

20  single employer issue.  After an impartial investigation, Region 20 of the NLRB issued an

21  unfair labor practice complaint against defendant Sunrise Operations LLC, a wholly owned

22  subsidiary of The Pasha Group, for unlawfully failing to provide requested information.

23  Administrative Law Judge Lisa Ross issued a decision finding that defendant Sunrise

24  Operations violated the NLRA when it failed to provide the requested information.  [A true

25  and correct copy of the ALJ Decision is attached hereto as Exhibit P, and incorporated

26  herein by this reference.]

27

28

715360v1  12025-30001

## FACTUAL ALLEGATIONS

20.     At all relevant times herein, the parties have been signatory to a written collective bargaining agreement, which consists of a master agreement dated 1981-1984 along with Memoranda of Understanding ("MOU") that supplement and amend the master agreement, setting forth terms and conditions of employment for a bargaining unit of LDO employees working on four Pasha Hawaii oceangoing containerships traveling among the ports of Oakland, Los Angeles, and Honolulu (collectively referred to herein as "Pasha CBA").  The Pasha CBA's Grievance Procedure and Arbitration provision from the 1981-1984 agreement at Section XXXVI provides:

**1.     Licensed Personnel Board**

There shall be no strikes, lockouts or stoppages of work during the period of this Agreement, provided however that the foregoing provisions shall not be applicable if the Company becomes delinquent in Pension, Welfare, Vacation, or any other MM&P Fund, Plan or Committee payments, allotments, or earned wages.

All disputes relating to the interpretation or performance of this Agreement which may arise between the Parties to this Agreement shall be determined by a Licensed Personnel Board consisting of two persons appointed by the Organization [understood to refer to MM&P] and two persons appointed by the Company. The Parties shall submit any such dispute for decision by the Board and they agree to be bound by the decision of a majority thereof. The Board shall agree to such rules of procedure as it may deem necessary.

In the event no settlement is reached by the Board, the issue may be referred to the Arbitrator by either Party for arbitration. The cost of the arbitration shall be borne equally by the Organization and the Company involved.

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

Unless some other place is mutually agreed upon, the Board shall meet in New York, or in San Francisco for PMA Companies, promptly upon the written notice from either the Organization or the Company.

The Organization and the Company may appoint alternates to act in place of the regular members of the Board.

**2.      Arbitrator and Alternate Arbitrator**

Burton B. Turkus shall serve as Arbitrator, and Eva Robbins shall serve as Alternate Arbitrator.

During the fifteen (15) days before each anniversary date of this Agreement commencing with June 16, 1977, either the Company or the Organization shall have the unrestricted right to terminate the appointment of the Arbitrator or the Alternate Arbitrator, or both.

In the event the Arbitrator is terminated, the Alternate Arbitrator shall succeed to such position, and the Parties shall promptly meet to attempt to agree upon this selection of a new Alternate Arbitrator. If no agreement is reached within seven (7) days after the termination takes place, the Alternate Arbitrator shall be selected under the provisions of the American Arbitration Association governing the selection of an ad hoc Arbitrator.

In the event the Alternate Arbitrator is terminated, or both the Arbitrator and the Alternate Arbitrator are terminated in the same year, the successor, or successors shall be selected in accordance with the foregoing provisions, provided, however, that in the event both the Arbitrator and the Alternate Arbitrator are terminated in the same year, the Arbitrator shall continue to serve until his successor is selected.

The Parties agree that all questions as to whether a dispute is arbitrable shall be submitted to and decided by the Arbitrator; provided, however, the Arbitrator shall be without authority to amend the terms of the Collective Bargaining Agreement. The Parties agree that all questions

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

concerning the interpretation of an Award made by the Arbitrator shall be re-submitted to the Arbitrator for a decision.

**3.       Resolution of Grievances by Board**

The Arbitrator will serve as Chairman of any meeting of the Licensed Personnel Board without vote. If said Board resolves any grievance, either by a majority vote or by mutual agreement, said grievance shall be deemed settled, and the decision shall be final and binding.

21.       In 1984, the Grievance Procedure and Arbitration Section was modified: Amend 1. Paragraph 4 to read:

Unless some other place is mutually agreed upon, the grievance proceedings shall be held at the Union Headquarters in Linthicum Heights, Maryland. Licensed Personnel Board meetings shall continue from day-to-day until completed, unless the parties agree otherwise.

Section XXXVI (2) shall be amended to provide that Arthur Stark shall serve as Arbitrator, and Walter Gelhorn shall serve as Alternate Arbitrator.

22.       The 1981-1984 Master Agreement, Section II provides for broad recognition, applying to all LDOs on "U.S.-Flag oceangoing vessels" with an entire section covering replacement vessels in Section II.4 (with economic consequences for violating it— paragraph 4(g)).  Also, Section V, Vessels Bound By The Agreement, is expressly designed to avoid work being siphoned away from the Union through the use of a parent or subsidiary company, while listing extensive requirements for new construction. Section V.1(a), Vessel Coverage, provides: "This Agreement covers the Licensed Deck Officers employed on oceangoing U.S.-flag vessels, owned, operated or bareboat chartered (both at present or at any time during the life of this Agreement) by the Company or any of its subsidiaries or affiliates (whether so at present or at any time during the life of this Agreement) as an owner, agent, operator or bareboat charterer." Section V.1(b) broadly defines "subsidiary" and "affiliate": "The term 'subsidiary' or 'affiliate' shall be deemed to include any business entity whether corporate, partnership, trust, individual or otherwise,

Bush Gottlieb
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

18

Case No.: 3:20-cv-04722

715360v1  12025-30001

1  which is effectively controlled by or effectively controls the Company either directly or

2  indirectly."

3      23.     On August 3, 2018, impartial Arbitrator Richard McNeill issued a decision

4  under the Pasha CBA explaining the definitions of "subsidiary" and "affiliate" to be

5  written "in such broad terms" that he "could conclude that TPG-related entities other than

6  Sunrise should be parties to the collective bargaining agreement without determining any

7  of them to be single employer." [A true and correct copy of McNeill's 2018 arbitration

8  decision and award is attached hereto as Exhibit Q, and incorporated herein by this

9  reference. *See* Exh. Q, p. 12.]  Arbitrator McNeill further ruled: "In the event that Sunrise

10  attempts to avoid its obligations under the collective bargaining agreement by shifting

11  ownership, operations, or bargaining unit work to another TPG-related entity as [MM&P]

12  suspects it will, the Union has remedies under the Section V and the Employment Security

13  language."  [*Id*., pp. 17-18.]

14      24.     Under the Pasha CBA, Section XXXVI.1, the Union promises that it will not

15  engage in "strikes, lockouts or stoppages of work during the period of this Agreement".

16  Therefore, the Union has not exercised its federal statutory and constitutional rights to

17  engage in economic action against Defendants even though in return for the Union's

18  promise not to engage in economic action, the Pasha CBA Section XXXVI requires

19  Defendants to arbitrate all disputes related to the agreement—a promise Defendants have

20  blatantly repudiated.

21      25.     Under the Pasha CBA, Section XXXVI.2, the parties expressly provided that

22  the arbitrator, and not the courts, decide all arbitrability questions: "The Parties agree that

23  all questions as to whether a dispute is arbitrable shall be submitted to and decided by the

24  Arbitrator."

25      26.     Under the Pasha CBA, Section V.4.b, "all new construction contracts" must

26  meet certain specifications.  For example, LDOs' quarters must contain "an upholstered

27  high-backed recliner-type chair . . . and a bunk of not less than 54" x 78"."  Under Section

28  V.4.h(ii), the Navigating Bridge must have "a cold water drinking fountain."

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

715360v1  12025-30001

27.     On July 1, 1990, Defendants' predecessor company and the Union agreed to an MOU containing Article X—Training, requiring the employer to "meet to negotiate training requirements" when it "acquires new vessels with significant unique operating equipment."

28.     On June 11, 2004, Defendants' predecessor company and the Union agreed to an MOU containing Section 13, requiring the employer to hire an additional third mate position for certain vessels: "At the option of the Company, the five (5) additional Third Mates currently employed aboard vessels in the Caribbean Trade may be shifted to other Company vessels covered by this agreement provided that there shall be no loss of billet days of employment and that there shall be no interruption or reduction in the dispatch of an additional Third Mate once he is assigned to a particular vessel."

29.     A "billet" is a nautical term for a work assignment to a ship (Captain/Master, Chief Mate, Second Mate, Third Mate), and a "billet day" is the financial equivalent of a day of work for a particular assignment.

30.     The CBA has been fully binding upon Defendants at all relevant times herein, and is currently in effect and does not expire until 2027.

31.     Since the Acquisition, the parties have had two arbitration hearings: (1) the proceeding referred to above before Richard McNeill, Esq., and (2) an employee termination dispute before Elliot H. Shaller, Esq.  Both arbitration hearings were administered through AAA, and were not presented to a Licensed Personnel Board.  No Licensed Personnel Board has been constituted for a dispute with MM&P since 2000.

**ADDITIONAL THIRD MATE GRIEVANCE**

32.     At the time of the Acquisition, two of the five additional third mate positions were on the Hawaii trade lane purchased by The Pasha Group, and three additional third mates were on vessels on Horizon's Alaska trade lane which were purchased by Matson. Defendant(s) assigned one additional third mate to the *Enterprise* and the *Pacific* for the triangle run from Oakland to Los Angeles to Honolulu and back to Oakland, and have

Bush Gottlieb
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

715360v1  12025-30001

moved additional third mates to the *Reliance* and the *Spirit* when the *Enterprise* and the *Pacific* have been dry docked for maintenance.

33.     The past practice under the Pasha CBA has been that when a vessel with an additional third mate was dry docked for maintenance, in order to preserve billet days under the July 2004 MOU Section 13, the additional third mate would be shifted to the vessel replacing the dry docked vessel to prevent the loss of billet days.  Two times, in September 2015 and April 2017, Defendant(s) failed to assign an additional third mate to a replacement vessel during a dry dock.  Both times, Defendant(s) corrected the error and made up the billet days.

34.     At the beginning of 2018, the *Enterprise* and the *Pacific* had an additional third mate position.  In March 2018, when the *Enterprise* was dry docked for repair, MM&P discovered that an additional third mate had not been moved to another vessel. When the *Enterprise* went back into service in June 2018, an additional third mate was placed on the vessel.  At that point, the outstanding issue was the 91 billet days lost from March 15, 2018 to June 13, 2018.

35.     On January 25, 2020, Edward Washburn, Pasha Hawaii Senior Vice President, Fleet Operations, emailed MM&P Vice President J. Lars Turner to advise that the employer had unilaterally decided not to fill the additional third mate position after the two positions' 120-day at sea periods ended, explaining it did not have to because three months earlier the NLRB had declined to prosecute the employer under the NLRA:

> As of 10/21/19 it is confirmed by NLRB that Sunrise Operations LLC is not required by to (sic) carry an extra 3rd mate. This will be company policy and as each 8-12 watch third mate (extra 3rd mate) completes his rotary position we will no longer maintain that position. The 12-4 watch third mate is the historical and industry standard regular third mate. We are allowing the position to continue for the duration of the rotary position as a courtesy to the deck officer who took the job. There will be no 8-12 watch third mate reliefs allowed during the last 120 day rotary positions.

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

1    [A true and correct copy of an email chain between Washburn and Turner beginning with

2    Washburn's January 25, 2020 email, without the attachment, through the March 3, 2020

3    email is attached hereto as Exhibit R, and incorporated herein by this reference.]

4        36.    On January 28, 2020, Turner responded to Washburn: "MM&P disagrees

5    with your interpretation and application of the NLRB letter.  The NLRB simply decided

6    that there was no violation of the National Labor Relations Act; the NLRB does not

7    interpret our Agreement.  An arbitrator is the appropriate entity to interpret the contract

8    when we do not agree.  We already have a grievance outstanding on this issue.  Without

9    waiving our position regarding the contractual requirement to hold arbitrations in

10   Linthicum Heights, the Union will agree to have the grievance heard in Oakland to

11   accommodate your desire not to travel to Baltimore.  I will request Union's counsel to ask

12   AAA for a San Francisco arbitrator panel."  [Exh. R, p. 2.]

13       37.    On March 3, 2020, during a meeting with Washburn, Turner and others from

14   MM&P over Zoom, Washburn refused to fill the third mate positions.  Later that day,

15   Washburn responded by email to Turner: "We will agree to arbitrate in Oakland. Unions

16   (sic) counsel should request AAA for an arbitrator panel." [Exh. R, p. 1.]

17       38.    On or about April 21, 2020, MM&P's Agent, Pacific Ports Jeremy Hope

18   emailed to Washburn a grievance letter concerning the Additional Third Mates and

19   enclosed the AAA labor demand form that had been submitted to AAA.  [A true and

20   correct copy of Hope's email, grievance letter, and AAA demand form are attached hereto

21   as Exhibit S, and incorporated herein by this reference.]

22       39.    On June 4, 2020, AAA informed the parties that Arbitrator Ronald Hoh had

23   been appointed to hear the dispute.  [A true and correct copy of AAA's June 4 letter is

24   attached hereto as Exhibit T, and incorporated herein by this reference.]

25       40.    On June 24, 2020, AAA informed the parties that the hearing had been set

26   for September 8, 2020.  [A true and correct copy of AAA's June 24 letter is attached

27   hereto as Exhibit U, and incorporated herein by this reference.]

28

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

41.     In response to AAA's June 24 letter, MM&P's outside counsel Lisa Demidovich noted that the Union believed the hearing may last more than one day and therefore would like to reserve September 9 in addition to September 8, and asked Washburn if there was "any objection to [AAA] letting Arbitrator Hoh know" of the Union's request to reserve September 9.  [A true and correct copy of the email chain through July 8 that began with AAA's June 24 email, and including Demidovich's June 24 email, is attached hereto as Exhibit V, and incorporated herein by this reference.]

42.     On June 25, 2020, Washburn responded to Demidovich:

Sunrise Operations LLC agreed to participate in the hearing subject to:  (1) the Union's confirmation of the understanding of the employer, Sunrise Operations LLC, that the arbitration will take place in Oakland, CA; and (2) arbitration can be held in conformity with the then-current travel and meeting restrictions associated with COVID-19.

Sunrise Operations LLC believes this is a very simple issue which will not take more than one day. [Exh. V, p. 4.]

43.     That same day, Demidovich responded:

The Parties have agreed to have this one hearing in Oakland (see March 3, 2020 email attached), and we will follow all then-current travel and meeting restriction laws associated with COVID-19 with respect to the hearing.  We agree this is not complicated, but our case in chief may last an entire day.  If the hearing lasts only one day, the Union will agree on this one time, non-citable, non-precedential basis to pay the Company's half of the Arbitrator's cancellation fee of $1,500 for September 9.  With that representation, does the Company have any objection to the Union reaching out to Arbitrator Hoh to reserve September 9?  [*Id*., p. 3.]

44.     Also on June 25, Washburn responded by refusing to arbitrate the dispute:

In reviewing the CBA regarding this issue I realized we have not followed the proper procedure to get to arbitration. I believe we are obligated to follow

Bush Gottlieb
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

COMPLAINT

Case No.: 3:20-cv-04722

the procedures outlined in the CBA which has not been done. I am including the CBA excerpt. This dispute is about contract interpretation. Therefore the parties must go before the License Personnel Board and not reach a settlement before arbitration can take place. [*Id*., p. 2, referencing CBA Section XXXVI.]

45.     On July 8, 2020, Demidovich responded by noting the disingenuousness of raising the Licensed Personnel Board issue at the eleventh hour, and that under United States Supreme Court precedent, the procedural defense must be raised with the arbitrator and is not a valid defense to avoid an arbitration hearing.  Demidovich wrote: "[U]nless the Company advises us by July 10 that it will participate in the arbitration scheduled for September 8, we will file a petition to compel arbitration in federal court and will seek recovery of our attorneys' fees from the Company."  [*Id*., p. 1.]

46.     To this day, Defendants have failed and refused to state that they will attend or otherwise participate in the arbitration hearing set for September 8, 2020, before Arbitrator Ronald Hoh, to occur at the MM&P's Oakland Office.

## NEW CONSTRUCTION REQUIREMENTS AND TRAINING GRIEVANCE

47.     On August 24, 2017, Pasha Hawaii announced that it signed a contract with a subsidiary of the Keppel Corporation (Keppel AmFELS) to build two new liquefied natural gas–powered containerships in Brownsville, Texas. [A true and correct copy of various press releases are attached hereto as Exhibits W-EE, and are incorporated herein by this reference.  *See* Exh. CC (Keppel's press release); Exh. DD (Pasha Hawaii's press release).]   The previous day, Washburn—over his Pasha Hawaii signature block and on his TPG email address—requested that the news "Contract signed!" be sent to the four containerships, explaining it is a "great day in our continued success." [A true and correct copy of Washburn's August 23, 2017 email is attached hereto as Exhibit FF and incorporated herein by this reference.]

48.     On November 4, 2019, Washburn informed Turner over Zoom that the design for the containerships under construction would not have a high-back recliner.

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

49.     On November 5, 2019, Washburn informed Turner over Zoom that the bunk size in the quarters of the second mate and third mate of containerships under construction would be smaller than the size specified in the Pasha CBA (78" by 54") in that the second and third mates' bunk would be 80" by 43".

50.     On April 8, 2020, Washburn informed Turner over Zoom that the navigational bridge on the containerships under construction would not have a cold water drinking fountain.

51.     On May 8, 2020, Washburn stated to Turner unequivocally that the containerships under construction would not be changed to ensure compliance with the Pasha CBA such that bunk sizes would not be changed, recliners would not be put in the LDOs' quarters, and a drinking fountain would not be installed on the navigational bridge.

52.     On January 16, 2020, Washburn noted in an email to MM&P Vice President Turner that he "expect[s] training will start in April" for two new containerships that will join the Pasha Hawaii fleet.  [A true and correct copy of the email chain with Washburn's January 16 response is attached hereto as Exhibit GG and incorporated herein by this reference.]

53.     On January 24, 2020, Turner responded via email and US Mail calling Washburn's attention to Section X of the 1990 MOU, which states, in pertinent part, "If [Sunrise] acquires new vessels with significant unique operating equipment, [Sunrise] and [MM&P] will meet to negotiate training requirements" and requesting a meeting and negotiations regarding the training requirements for new vessels mentioned in Washburn's January 16 email.  [A true and correct copy of Turner's January 24 email with attached letter is attached hereto as Exhibit HH, and incorporated herein by this reference.]

54.     On February 10, 2020, in a Zoom meeting, MM&P's Turner verbally invoked the July 1, 1990 MOU, Section X to Washburn, and asked to negotiate over the training requirements for the new LNG-powered containerships the *George III* and the *Janet Marie*.  Washburn refused to negotiate with MM&P over training requirements during MM&P's negotiations with Sunrise Operations because Sunrise Operations was not

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

COMPLAINT

715360v1  12025-30001

1   going to manage the *George III* or *Janet Marie*, but instead those vessels would be

2   managed by another TPG wholly-owned subsidiary Blue Sky LLC.

3       55.     Again, on May 19, 2020, Turner again requested Washburn to negotiate over

4   training requirements for the *George III* and the *Janet Marie* because the last the Union

5   had heard, training would start in April.  Washburn responded that training had not started

6   because the training facilities had closed due to COVID-19.  Turner noted that the training

7   facilities were reopening.  Washburn nevertheless expressly refused to discuss the training

8   and refused to consider the Union's written proposal, explaining his opinion to the Union

9   that it isn't the right time to talk about training for those two vessels.

10      56.     On May 21, 2020, the Union exercised its right to submit the unresolved

11  terms of the new construction and training requirements to binding arbitration.  [A true and

12  correct copy of the Union's email correspondence to Washburn and grievance letter are

13  attached hereto as Exhibit II, and incorporated herein by this reference.]

14      57.     Consistent with the parties' past practice, the Union notified AAA of its

15  intent to arbitrate and received a panel of arbitrators.  [A true and correct copy of the

16  Union's email correspondence to AAA is attached hereto as Exhibit JJ, and incorporated

17  herein by this reference.]

18      58.     On June 25, 2020, outside counsel for Sunrise Operations Miossi responded

19  to Union outside counsel Demidovich that no grievance had been filed, that the dispute

20  concerned "two vessels that are covered by a collective bargaining agreement with the

21  American Maritime Officers union," and that the grievance needed to be presented to the

22  Licensed Personnel Board.  [A true and correct copy of the email chain including Miossi's

23  June 25 email to Demidovich and Demidovich's July 8 response including attachment are

24  attached hereto as Exhibit KK, and incorporated herein by this reference.]  Miossi later

25  responded that he "made an error," and "confused the vessels," and American Maritime

26  Officers does not have any "representational and/or contractual rights on the *George III* or

27  *Jean* (sic) *Marie*."  [Exh. KK.]

28

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

59.     On July 1, 2020, Defendants' CEO George Pasha IV informed MM&P-represented LDOs that the construction financing for the *George III* was funded on June 30, 2020, and the *George III* is scheduled to join the Pasha Hawaii fleet before the end of 2020.

60.     On July 8, 2020, Demidovich responded to Miossi by attaching the grievance letter and by noting the disingenuousness of raising the Licensed Personnel Board at this stage of the proceeding, and that under United States Supreme Court precedent, the procedural defense must be raised with the arbitrator and is not a valid defense to avoid an arbitration hearing.  Demidovich wrote: "[U]nless the Company advises us by July 10 that it will participate in this arbitration, we will file a petition to compel arbitration in federal court and will seek recovery of our attorneys' fees from the Company."  *See* Exh. KK.

61.     To this day, Defendants have failed and refused to inform the Union that it will participate in an arbitration hearing over this grievance and has failed and refused to participate in the AAA arbitrator-selection process.

## CAUSE OF ACTION

### [Petition to Compel Arbitration, LMRA § 301, 29 U.S.C. § 185]

62.     MM&P incorporates paragraphs 1 through 61 as if expressly set forth herein.

63.     The Pasha CBA is a labor-management agreement governed by LMRA § 301, 29 U.S.C. § 185.  *HERE v. Marriott Corp.,* 961 F.2d 1464, 1466 (9th Cir. 1992).

64.     The Pasha CBA is valid and enforceable.

65.     Defendants have a current and ongoing contractual obligation to submit grievances over disputes related to the agreement to arbitration, but Defendants have failed to comply with that obligation such that the Court should now compel Defendants to do so.

66.     The LMRA empowers this Court to compel Defendants to arbitrate the disputed grievances because federal courts fashion federal common law to govern lawsuits for violation of collective bargaining agreements.  *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 40 n. 9 (1987).  Federal courts look to the Federal Arbitration Act ("FAA") for guidance to analyze CBA arbitration disputes.  *See id.*

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

COMPLAINT

Case No.: 3:20-cv-04722

67.     Supported by the strong federal policy favoring labor arbitration, federal courts may import to petitions to compel arbitration the FAA superseding Federal Rule of Civil Procedure Rule 81(a)(6)(B), and instead provide that after giving five days' notice in writing, a party may petition a court for an order compelling arbitration.  *See* 9 U.S.C. § 4 (2018).

68.     "[T]o be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960).  "The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious." *United Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960).

69.     The Pasha CBA specifically provides that disputes over arbitrability are for the arbitrator to decide.

70.     Supreme Court precedent establishes that any procedural questions about compliance with the Pasha CBA's grievance procedure, such as establishing a LPB when past practice has been to not have a LPB for decades, must be left to the arbitrator.  "Once it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." *John Wiley & Sons v. Livingston*, 376 U.S. 543, 557, 559 (1964) (holding "procedural disagreements" are regarded "not as separate disputes but as aspects of the dispute which called the grievance procedures into play").

COMPLAINT

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

71.     Defendants' refusal to proceed to arbitration on two separate grievances has violated the Pasha CBA and LMRA § 301.

72.     MM&P has not waived its right to compel arbitration MM&P has satisfactorily performed all duties and obligations under the Pasha CBA that the contract required of it.  Defendants have no valid basis for failing and refusing to honor its commitment to arbitrate all disputes arising under the Pasha CBA.

73.     MM&P and its members are without any adequate remedy at law and will suffer irreparable injury because Defendants are refusing to comply with the Agreement, particularly on the training and ship requirements grievance, as the *George III* is scheduled to begin service in 2020.  [*See, supra,* ¶ 59.]

74.     Defendants' refusal to arbitrate two grievances based on a claim that an LPB must be convened is not substantially justified, where Defendant has arbitrated two prior grievances without an LPB and no LPB has existed for decades.  In a similar case where an employer refused to arbitrate a grievance based on an alleged failure to comply with an aspect of the grievance procedure, there timeliness, the court held the union was entitled to attorneys' fees because the law in the area was well-settled that such "procedural arbitrability" issues are for the arbitrator to decide.  *Wash. Hosp. Ctr. v. SEIU, Local 722*, 746 F.2d 1503, 1512 (D.C. Cir. 1984) (holding "the award of fees [to the union] with respect to these two grievances" that the employer refused to arbitrate because "employers may not resist arbitration on procedural grounds and that the law on this point is very clear"); *Int'l Union, United Auto. v. Williams Controls, Inc.*, 570 F. Supp. 2d 1273, 1279 (D. Or. 2008), citing *Local 285, SEIU v. Nonotuck Resource Assocs., Inc.*, 64 F.3d 735, 739 (1st Cir. 1995), (holding union's attorneys' fees must be awarded where "company failed to provide any valid cases in support of its argument that the timeliness of the grievances is not an issue for arbitration, and it has ignored substantial precedent requiring procedural arbitrability issues, such as timeliness, to be decided by an arbitrator," thereby the company "has delayed and forced the Union to expend resources litigating this issue"); *Sheet Metal Workers' Int'l Ass'n v. Madison Indus.*, 84 F.3d 1186, 1192 (9th Cir. 1996).

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

COMPLAINT

715360v1  12025-30001

75.     Defendants' shifting reasons for refusing to arbitration demonstrates that the refusal has been in bad faith and a fee award is therefore independently proper.  *Varnes v. Local 91, Glass Bottle Blowers Ass'n*, 674 F.2d 1365, 1369 (11th Cir. 1982) ("[A] court can grant attorney's fees under its equity power if a party violates [LMRA] § 301(a) in bad faith . . . .").  Defendants refusing to arbitrate based on a non-existent LPB has been raised in bad faith to delay arbitration and require the union to expend resources in federal court to get to a contractually-mandated arbitration hearing.

## **PRAYER FOR RELIEF**

WHEREFORE, MM&P prays that the Court issue an order:

1.     Directing Defendants to proceed to arbitration on MM&P's grievances in accordance with the CBA, including appearing at the September 8 arbitration hearing before Arbitrator Hoh in Oakland on the additional third mate grievance and selecting an arbitrator on the ship requirements and training grievance, within five business days of the order's issuance;

2.     Requiring Defendants to pay MM&P's costs, reasonable attorneys' fees and expenses incurred in bringing this Complaint and Petition; and

3.     All other relief in its favor as the Court deems appropriate.

DATED:  July 15, 2020

IRA L. GOTTLIEB
LISA C. DEMIDOVICH
BUSH GOTTLIEB, A Law Corporation


By: _____ /s/ *Lisa C. Demidovich* _____
LISA C. DEMIDOVICH
Attorneys for Plaintiff International Organization of Masters, Mates & Pilots

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

715360v1  12025-30001

1

## **VERIFICATION**

2    I have read the foregoing INTERNATIONAL ORGANIZATION OF MASTERS,

3   MATES & PILOTS' COMPLAINT FOR VIOLATION OF THE LABOR

4   MANAGEMENT RELATIONS ACT AND PETITON TO COMPEL ARBITRATION

5   (29 U.S.C. § 185) and know its contents, and I certify the same is true of my knowledge,

6   except to those matters therein that are stated upon my information and belief, and as to

7   those matters, I believe them to be true.

8    I serve as International Counsel for plaintiff INTERNATIONAL ORGANIZATION

9   OF MASTERS, MATES & PILOTS, a party to this action, and make this verification as

10   attorney and agent for Plaintiff with authority to make said verification and because as

11   attorney the facts set forth in the Complaint are within my knowledge and I am more

12   familiar with such facts.  I declare under penalty of perjury under the laws of the State of

13   California that the foregoing is true and correct.

14    Executed on July 15, 2020, at Columbia, Maryland.

15

16   _Gabriel A. Terrasa_

17   Print Name of Signatory          Signature

18

19

20

21

22

23

24

25

26

27

28

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

715360v1  12025-30001